Van Houten *v.* Van Houten.

---

Catharine Van Houten et al., appellants,

*v.*

John R. Van Houten et al., respondents.

Section 110 of the "Act respecting the orphans court, and relating to the powers and duties of the ordinary and the orphans court and surrogates" (*Rev. p. 753*), does not control the court of chancery in fixing the commissions allowable to trustees appointed by that court to execute the trusts created by a will.

### STATEMENT OF FACTS.

On the 2d day of July, 1888, at the chancery chambers, in Jersey City, before his Honor A. V. Van Fleet, vice-chancellor, a hearing was had on the exceptions filed by John R. Van Houten and others to the report made in said matter by Washington B. Williams, esquire, one of the masters of this court, and, at the same time, a motion was made, on behalf of the trustees, to have the allowances or compensation of the trustees, for their services, fixed by the court. The motions were heard in the presence of Preston Stevenson, of counsel with the defendants, John R. Van Houten, Catharine Van Houten and Adrian Post;

of John S. Barkalow, of counsel with the defendants, William H. Post and Joseph C. Hall; William Pennington, was present and associated with John S. Barkalow. The trustees were represented by their counsel, Theodore Runyon.

At the beginning of the hearing counsel for the exceptants intimated that he was not desirous of arguing the exceptions (to the master's report), with a view to setting aside the report, but was rather inclined to discuss the subject of exceptions with a view to its effect upon the allowance of commissions to the trustees. To this mode of proceeding and adjudication the counsel of the trustees objected, and the vice-chancellor then said to the counsel of the exceptants that the exceptions must be argued upon their merits or not at all, and, if found good, they would be allowed and the report would be dealt with accordingly, and, if found bad, they would be overruled and the report confirmed; that they could not be used merely for the purpose of reducing the trustees' commissions, and that, if the exceptions should be overruled, then the question as to the amount of commissions to be allowed to the trustees would be in order. The counsel then proceeded to argue the exceptions, *and they were overruled.* The counsel for petitioners then moved for the allowance of commissions to the trustees.

Inquiry was made by Mr. Stevenson whether there was a petition from the trustees on the subject of commissions—praying for the allowance of the commissions—to which the trustees' counsel replied that he believed there was not, and that he thought that none was necessary. Mr. Stevenson acquiesced. The petitioners' counsel then read the following Statement:

Rachel R. Van Houten, by her will, appointed George Post and John R. Van Houten her executors. Differences having arisen between these executors, one of them, George Post, filed a bill in chancery against the other one, John R. Van Houten, and others. On the 7th day of January, 1881, by consent of the said parties and of their counsel, a decree was made in said suit, in which it was recited that, by reason of the feeling existing between said executors, their inability to work in harmony, and

because of their advanced age, it was advisable that new trustees be appointed, and Thomas M. Moore and John Reynolds were appointed trustees under said will in place of said Van Houten and Post.

The new trustees each gave a bond for $25,000. By the terms of the decree the new trustees were to stand in the place of the old trustees, invested with all the trust before then resting upon the old trustees, except as to the "Peace and Plenty" lot, but the decree reserved to the old trustees any personal power or duty that might exist under the will, and which could be exercised by no other person.

The decree provided also that the pending suit in chancery should continue, for the purpose of securing and having a settlement between the old trustees and the estate. The suit was referred, first, to ex-Vice-Chancellor Dodd, and afterwards to Judge Stevens. A settlement of this suit was afterwards made, under an agreement signed by George Post and John R. Van Houten and William H. Post, dated December 20th, 1881. Under this agreement provision was made for the payment, by the new trustees, of counsel fees, which had been incurred in said suit, and fees to Judge Stevens, the master.

The estate of which the new trustees took charge consisted of securities and cash to the amount of $4,499.22, of five stores on Main street, one store on Broadway and of three residences. (For particulars see accounts of December 15th, 1883, and November 1st, 1886). The residue of the estate consisted of unimproved real estate, situate at different places in the city of Paterson, the largest tract being a parcel on Broadway, containing about three hundred and eighty-one lots.

The taxes on the property for 1881 were $5,974. The annual income was insufficient to pay the taxes and cost of insurance and repairs. (See report of Isaac Van Wagoner, master, filed December 5th, 1882, and testimony of Moore and Reynolds thereto annexed.)

When the trustees took charge of the trust estate the indebtedness of the estate was about $40,000, due chiefly to the city of Paterson for taxes. Some of the real estate had been sold for

Van Houten *v.* Van Houten.

taxes.   There was in force, at this time, a statute which per-
mitted the compromise of taxes at seven per cent. interest, pro-
vided the payment was made within the time limited in the
statute.   The period so limited had nearly expired at the time
of the appointment of the new trustees.   In order to get the
benefit of this statute, they arranged for a temporary loan of
$40,000, and prepared a petition to the chancellor for leave to
borrow on mortgage the money necessary to re-imburse the trust-
ees.   They also went to the legislature, then in session, and
contributed, by their efforts, to secure an extension of the act for
the compromise of taxes at seven per cent.

The trustees soon sold sufficient land to enable them to pay all
arrears of taxes.   By this compromise of taxes about $5,000
were saved to the estate.

When the estate came into the hands of the trustees, in
January, 1881, seventy-two per cent. of the property was un-
productive; within a year and one-half this was reversed, and
eighty-nine per cent. of the estate was productive.

During this year and one-half the trustees sold the Broad-
way tract, containing three hundred and eighty-one lots—one
portion to the Paterson Extension Railroad, for $20,000; an-
other portion to said railroad company, for $1,000, and the rest
to C. L. Cornish, for $180,000.   During this period of eighteen
months they sold, also, other real estate to the amount of $18,694,
making the total sales, up to June 1st, 1882, $219,694.

The total amount of money and security received by the trustees
    since the time of their appointment, on account of the principal
    of the estate, as is shown by the accounts of December, 1883,
    December, 1884, and December, 1885, is.................................$277,188 40
To this amount should be added the value of the lands in charge
    of the trustees and not sold; a fair estimate would be.............. 137,500 00

Making the total principal of the estate in charge of the trustees...$414,688 40
The trustees, by order of November 13th, 1882, were allowed a
    commission on part of this principal, to wit, on...................... 52,961 00

        Balance of principal.............................................$361,727 40

A further explanation in regard to the Broadway tract of
three hundred and eighty-one lots may be useful.   In the testi-

mony annexed to the report of Isaac Van Wagoner, master, filed December 5th, 1882, the Broadway tract is called "Parcel 15." A reference to the testimony annexed to that report will show how the transaction in regard to this "Parcel 15" was viewed by the trustees.

Mr. Moore testified that, at the time "Parcel 15" came into the possession of the trustees, it consisted of unimproved land, bounded on the north by Broadway and on the east by York avenue, and that no streets ran through the tract. There was no building of any sort on the property; and that, since the land came into the possession of the trustees, three streets running east and west and one running north and south have been opened through the tract, all of which have been graded. Those streets were made and graded at the expense of the person who purchased the tract, according to the terms of his agreement with the trustees.

In order to ascertain the market value of the property, the efforts of the trustees were directed, first, to obtaining offers from real estate agents, without the trustees fixing the value. The offers received were from $100,000 to $125,000. The Paterson real estate agents claimed that the trustees were asking too much for the property, and ridiculed the idea of getting $180,000 for the property. Continuous efforts were made by the trustees to sell the Broadway tract, from the time of their appointment until the same was sold to Mr. Cornish.

Before offering the property to Mr. Cornish the trustees had carefully examined the tract, with a view to the best locations for streets, and made their estimates of the cost of improving the streets, and determined on a plan for improvement. They reached the conclusion that the property could be properly developed only by having streets projected through the same and the same graded, and they declined to sell to Mr. Cornish until they felt that they had a certain guarantee that the streets should be opened and graded by the purchaser. The trustees estimated that the cost of opening and grading the streets would not be less than $20,000.

Van Houten *v.* Van Houten.

Before consummating this sale with Mr. Cornish, in order that the trustees might ascertain if the parties in interest approved of it, they advised with George Post, William H. Post and John R. Van Houten and wife, all of whom approved of the sale.

Mr. Reynolds testified, that he was president of the Paterson Savings Institution, and appraiser of its real estate as well; that he was president of the Paterson Gas Light Company; that he had lived in Paterson forty-eight years; that when the Broadway tract came into the possession of the trustees it was partially fenced, part of it having been used as pasture; a portion of it had been used for raising corn, and portions of the fence had tumbled down, and they found it necessary, even before they could use it for pasture land, to replace some of the fence; there were no streets through the tract at all, and they found that it was taxed as farm land; that he notified a number of the land agents that the trustees would like to sell unimproved property in different locations, and a number of agents at once called upon him, and the matter of price of the different parcels owned by the estate was discussed, reference being made particularly to the Broadway tract; the first offer that was made was for single lots by parties living in the immediate neighborhood; they thought they could purchase lots at about $200 or $300 each.

About that time one of the land agents came to negotiate for a strip of land lying directly in the rear of the lands fronting on Mechanic street. After a consultation with his co-trustee, the price was fixed at $20,000, which the agent finally agreed to give, and that strip was sold to the Midland Railroad Company for $20,000 cash.

The next offer received by the trustees was $100,000 for the rest of the Broadway tract. Then from another, $120,000, and from still another, $125,000, which latter was the highest price ever offered to the trustees until the trustees effected the sale to Mr. Cornish for $180,000. When the trustees asked a much higher price than $125,000, it was a matter of ridicule among the Paterson real estate agents. This ridicule led Mr. Reynolds to make a calculation what the property should bring if sold on plots or parcels at retail. After showing that calculation to his

co-trustee, the trustees fixed the price of the property at $180,-000. Mr. Reynolds then informed the agents at what price the property could be purchased. A number of the agents then gave the property up, but Mr. McGregor, an agent in Paterson, called the attention of the trustees to Mr. Cornish, of New York, representing that he was an extensive dealer in real estate in New York, and that he, Mr. McGregor, had had some conversation with him in regard to this Broadway tract, and Mr. McGregor desired the trustees to see Mr. Cornish. The trustees at once went to New York and met Mr. Cornish. After a great deal of conversation in regard to price, he agreed to give the price asked, $180,000. The contract of sale to Mr. Cornish was made in about six months after the appointment of the trustees, during which period the trustees had made diligent efforts to sell the property. Mr. Moore either came to Paterson, or Mr. Reynolds went to Passaic, almost daily.

After the making of the Cornish contract, the duties of the trustees in carrying out its details were nearly as onerous as before the contract was made. It was their place to see that the provisions of the contract with Mr. Cornish were complied with. They agreed to aid him, and did aid him, in the carrying out of the contract. They had to see that the streets were graded according to the contract; that deeds were given to parties to whom Cornish sold; that the prices that had been fixed in the contract had been obtained. And the trustees had a great deal of conversation with parties who were nogotiating to purchase from Mr. Cornish.

Mr. John J. Brown, the president of the First National Bank, testified before Mr. Van Wagoner as follows:

"I have lived in Paterson, off and on, for sixty years; I have since my majority been a large owner of property; the same is located in quite a number of parts of Paterson; I was familiar with the Broadway tract, number 15, before it came into the possession of the trustees; it was used before they got it as farm land; it was entirely unimproved; no streets opened through it; I know, generally speaking, that there were about three hundred city lots in the tract; I never had occasion to fix any price on this tract; I heard that the trustees sold this tract for about $200,000: I regard it as a very successful sale, surprisingly so; when I heard the report of the agreement made of the

Van Houten *v.* Van Houten.

sale, I didn't think it would be completed or carried out; I did not think the purchaser would succeed; I understood that he was to make the improvements as to streets at his own expense; as far as I can recollect now, it is the largest sale of unimproved property in Paterson that I ever heard of; there is one sale, which I recollect now, which was of larger figures; I know the trustees; I would set down Mr. Reynolds as one of the best persons to value and sell property in Paterson; as to his judgment and capacity, I think he is capable of transacting any business he goes into."

Further particulars in regard to this sale and of the subsequent conduct of the trustees will be found in the testimony taken before Washington B. Williams, master, in 1887. See testimony of Mr. Cornish and Mr. Hobart.

The trustees have never paid any counsel fees, with the exception of $100, and have incurred no expense to the estate for the collection of rents and interest. In addition to the care of the various properties, a list of which properties will be found in "Schedule 10," in the report of November 18th, 1886, the trustees have had the duties and responsibility of investing and re-investing the moneys of the estate, besides attending to the various matters of litigation pertaining to the estate. Some idea of the amount of time and attention necessary for the collection of rents and interest, and making the various disbursements for insurance and repairs, may be had by a glance at the long schedule annexed to the report.

Counsel for the trustees, in making the motion for said allowances, referred to the accounts filed from time to time by the trustees as evidence of the character and value of the services of the trustees.

The said counsel for the trustees, in referring to the litigation in which said trustees were concerned, made special reference to the suit of Post against Van Houten, which was referred to F. W. Stevens, master; also to the suit, in the supreme court, of Charles Brown against the trustees, in February, 1883, for $4,000 damages, claimed by the plaintiff for an injury received by him from falling into a coal-hole in the sidewalk on Main street, in the city of Paterson; also to legal proceedings taken by the city of Paterson, in 1884, for the condemnation of land of the Van Houten estate for the opening of Clay street, under which pro-

ceedings an award was made, from which an appeal was taken by the trustees, in the Passaic circuit court. The amount involved was about $7,000. Also to a foreclosure suit against the Union Real Estate Improvement Company, in 1885, and a foreclosure suit against Abraham Van Houten; also a suit in the court of chancery respecting the "Peace and Plenty" lot, in which a question was involved as to liability of the trust estate for certain taxes; also to a suit in this court, in 1885, on the petition filed by the trustees for the construction of the will of the testatrix, which case was taken to the court of appeals; also to a suit for the redemption of property in Jones street, in Newark, which had been sold for taxes and a declaration of sale given; also to legal proceedings in the city of Paterson touching various sewer assessments.

. Counsel for the trustees also read the following estimate of the value of the estate, which, after counsel for the defendants had been heard thereon, was amended, by consent of all the parties, so as to increase the item of $277,188.40 to $277,813.

. Schedule showing the moneys and securities received by the trustees, from all sources, on account of the principal of the estate:

| | | |
|---|---:|---:|
| 1881. Securities and moneys received from John Hopper, solicitor of John R. Van Houten | $15,179 | 22 |
| Moneys received from sale of land as per "Schedule 3," account of December 1st, 1883 | 253,244 | 80 |
| Cash received from sales of land, as per "Schedule 3," account of December 1st, 1884 | 2,623 | 52 |
| Cash received from sales of land and for returned taxes of Jones street property, Newark, as per "Schedule 3," account of December 1st, 1885 | 6,140 | 86 |
| Total | $277,188 | 40 |
| Value of real estate still in hands of trustees, per "Exhibit Moore 2," | 137,500 | 00 |
| Total value of the principal of the estate | $414,688 | 40 |

During the statement made by the trustees' counsel, Mr. Stevenson asked what was the proof, in regard to a matter upon which the trustees' counsel was speaking—one of the services of

Van Houten v. Van Houten.

the trustees—and the latter then said he supposed that it was unnecessary to make any proof in regard to any of the services, because all the counsel were so thoroughly acquainted with all the services rendered by the trustees, but he said, " If proof is desired, it will be furnished on the spot; both of the trustees are here." To which Mr. Stevenson replied, that he would not put the trustees to proof. The argument then proceeded to the end and to a decision. There was an express waiver, by Mr. Stevenson, of proof of the services of the trustees. Not only were the commissions of the trustees fixed in this way, but, on the same hearing, the counsel fees were fixed in like manner.

Van Fleet, V. C.

The foregoing statement contains, according to my recollection, a full and accurate recital of all the facts which were laid before me, by either side, on the application to fix and settle the compensation to be made or allowed to the trustees in this case. I understood Mr. Stevenson to expressly admit that the facts recited in the foregoing statement embraced all the facts bearing on the question of compensation, and which should be considered in deciding that question. In his argument Mr. Stevenson neither mentioned nor referred to any other fact. His argument conceded the truth of all the matters contained in the foregoing statement, and neither counsel, during the argument, intimated or suggested that it would be necessary or desirable that any examination of the proofs in the case should be made before a decision was made. Therefore, on the close of the argument, believing that every fact bearing on the question of compensation was before me, and regarding the question presented for judgment as a very simple one, in view of the fact that all the matters entitled to consideration in forming a judgment were admitted, I proceeded to announce my conclusion. The reasons assigned, in support of my judgment, were based entirely on the facts which I understood to be admitted. Mr. Stevenson did not then assert or intimate that my judgment had been formed on an imperfect state of facts, or that there was a single fact in the case, having the slightest bearing on the question of compensation,

which had not been fully and fairly stated by the counsel of the trustees.

I desire it known that I have made this statement after having carefully read and considered Mr. Stevenson's Statement, which I will hereto annex.

The following is the "Statement" of Mr. Stevenson, referred to by the vice-chancellor:

In response to the "Statement" submitted by counsel for Moore and Reynolds, trustees &c., for the approval and certification of the court as to the facts occurring before the vice-chancellor on the 2d day of July, 1888, at the overruling of exceptions to the master's report herein and allowance of commissions to said trustees, the undersigned, solicitor and of counsel for Catharine Van Houten and Adrian Post, the exceptants and two of the parties in interest, begs leave to state, as his understanding, recollection and belief of what there occurred and the legal effect thereof.

The matter came before the vice-chancellor upon a notice served upon the undersigned by the trustees' solicitor, which will be found printed at page 5 of the case—the matter of trustees' commissions and the exceptions to the master's report being there treated as substantially one proceeding. It is to be noticed that the decree of the chancellor of August 18th, 1886, under which the trustees accounted before the master, expressly reserved the trustees' right to commissions, to be *determined upon the master's report,* as well as all other questions in the cause not disposed of finally by that decree. The exceptions were not filed by John R. Van Houten, as stated in the said "Statement" of counsel for the trustees, nor did John R. Van Houten take any part in the accounting, nor was he represented by counsel before the vice-chancellor upon the occasion referred to, the only matter of dispute before the master having been raised by Catharine Van Houten and Adrian Post solely, and the exceptions to the accounts and to the master's report having been filed solely in their behalf. At the opening, the question arose as to order of

Van Houten *v.* Van Houten.

proceeding, and the vice-chancellor asked the respective counsel to state just what was before him. Counsel for exceptants did so, and proceeded to state the nature of the exceptions to the master's report, which the vice-chancellor directed should be heard first. Whether the exceptions were overruled before the determination of the amount of allowances or not, I am not sure at this moment, but my impression now is, that counsel for the trustees was first heard upon both matters, and that both were decided by the vice-chancellor together, and that without delay, after counsel had closed. None of the depositions taken before the master were read before the vice-chancellor announced his decision.

At the opening of the address of the trustees' counsel, he was asked by the undersigned if he presented any petition from the trustees upon the question of their commissions, as none had been served with the notice of the application. He replied that he did not, and that the trustees did not think it necessary, or something to that effect. Thereupon the vice-chancellor stated that a question might arise as to the propriety of his proceeding to make an allowance of commissions without taking proofs from the trustees of the value of their services, and he suggested to their counsel whether the trustees should submit the matter as it then stood before the court or take further proof. Counsel for the trustees consulted with one or both of them then present (with Mr. Moore certainly), and announced as their decision that they did not desire to present any further evidence, but that if the court or counsel for the beneficiaries required it they were prepared to testify upon any matter as to which they might be interrogated. The vice-chancellor then turned to the several counsel for the beneficiaries, and asked them if they desired to have the trustees testify. The undersigned stated that he did not, as he deemed that the record already contained all that it was material for either party to present. Thereupon (the counsel for other beneficiaries also declining to examine the trustees) the vice-chancellor ordered counsel for the trustees to proceed with his argument. He did so, and proceeded to give a *resumé* of facts relating to the estate, and to the discharge of their duty

as trustees by the accountants, Moore and Reynolds. No "State-ment," which counsel for the trustees says that he " read," was submitted to the undersigned or spoken of by trustees' counsel as distinct documentary matter. What he read or stated orally appeared to the undersigned, and was presented to the court as argument upon the record then before the court. No offer was made to file any written paper as matter of record, nor was any request made of the undersigned to admit the truth of any gen-eral statement of facts contained in a written paper, or otherwise, except as hereinafter mentioned. All the facts stated before the court by trustees' counsel were matters contained in the record of the trustees' accountings, intermediate or final, either by way of direct testimony of the trustees, or others, or by reference in the several accounts ; and the " Statement" which the trustees' counsel now submits as having been formally " read " by him at this time (July 2d, 1888,) before the court, is (in so far as facts are concerned) but a summary of matters of record in this cause, including liberal drafts, literal or in his own language, of the testimony of witnesses upon one accounting or the other, with reference to the various accounts filed by the trustees, and to the testimony of witnesses who are not quoted or summarized *in ex-tenso.* The whole effect, therefore, of what counsel for trustees said to the court as bearing on the fidelity and value of their services, whether " read " by him or stated orally, was that of presenting his argument from the evidence then of record in the cause, and it was so understood and treated by the undersigned, and not otherwise. Had the undersigned supposed for a moment that his clients' interests were being disposed of upon the loose statements of counsel for the trustees, or his version or summary of the proofs contained in the record, rather than upon the record itself, he would have refused to proceed, and demanded that the trustees testify, with opportunity for cross-examination and con-tradiction. To show how unjust would be the conclusion that an alleged " Statement" of facts, not shown to their counsel or other-wise identified or made matter of record, was the ground upon which the rights of the parties represented by the undersigned were disposed of by the court, it is only necessary to notice the

Van Houten v. Van Houten.

conclusion of fact (contained in the summary made by trustees' counsel of the testimony of Mr. Moore before Van Wagoner, master, upon the intermediate accounting by the trustees), that all the beneficiaries of the estate had knowledge of, and assented to, the sale of the "Broadway tract" to one Cornish. This question is one of the most important involved in the exceptions to the accounts and to the master's report, and the conclusion thus stated by trustees' counsel is explicitly contradicted by one of the exceptants, who is thus mentioned in the so-called "Statement," in her testimony before Williams, master, upon the final accounting. This testimony was adduced before the master on the cross-examination of the witness by the trustees, and was not called for by her direct testimony. It ought, therefore, to bind the trustees upon the point involved; and yet, by this alleged "Statement," they ask to revive the *ex parte* assertion to the contrary, made by one of themselves many years before, and to bind this exceptant to its truth and accuracy.

In respect of the matter now submitted by trustees' counsel in supplement to the alleged "Statement," the undersigned has the same criticism to make. It is but a rehash of alleged oral statements made by counsel in the course of his argument. It is impossible at this time to say just what counsel for the trustees did say at the time, it not being thought important by the undersigned to take notes of the argument; but it is very certain that trustees' counsel confined his remarks to matters contained in the record, either by way of testimony or reference in the various accounts, and no other matters were mentioned. The subject-matter now presented as having been referred to by trustees' counsel, contains nothing not within the record of this cause, in one form or another, and warranting a reference to it for that reason, unless it be the matter mentioned as a suit concerning the "Peace and Plenty" lot, which is matter of independent record in this court, but which the undersigned does not remember as being spoken of by counsel in his argument. No "estimate of the value of the estate" was "read" in the hearing of undersigned. A statement of the amount of personalty upon which the commissions were to be calculated was agreed upon, based

upon the totals of the trustees' final account, after deducting about $53,000 of the principal upon which they had already received commissions. Had the written estimate now presented been submitted to the undersigned, he would have discovered the fact that it is clearly erroneous, claiming a recovery to the estate from property in Newark of $6,140.86, when the actual amount, as shown by the trustees' account (Schedule III., account of December, 1885) is $3,140.86, less taxes and expenses of redemption paid out, $885.65—$2,255.21. I was not "heard" upon the value of the personalty at all. I did not argue the matter before the court. I agreed on the amount of the estate, taking the amount as shown by the accounts given me by the solicitor (not counsel) for the trustees, after being sure that the trustees were not including twice the $100,000 or more involved in the matter which formed the basis of the exceptions.

As to the real estate, an appraisement by Mr. Reynolds, one of the trustees, was submitted to me. It had been put in evidence by Mr. Moore before Williams, master, and, after going over it, I acknowledged myself as satisfied with the several values therein contained. It was, therefore, taken as the basis of calculation before the vice-chancellor. I objected, and argued before the vice-chancellor against any allowance upon the value of unsold real estate, but he overruled my objection.

The decree was drawn up by the solicitor for the trustees after submission to the undersigned, who suggested certain amendments, which were adopted. No suggestion was ever made to the undersigned that any facts had been admitted or waiver made by him, as furnishing other basis for the decree than matters of record herein, until late in October last, the notice of appeal having been served in September. There was no "waiver" or agreement not to require proof of the value of the trustees' services on the part of the undersigned other than that hereinbefore stated. If counsel for the trustees understood anything more than this, it was not so understood by the undersigned, nor was it, as he verily believes, warranted by what had occurred in the presence of the court.

Van Houten v. Van Houten.

As to fixing counsel fees, all parties consented to what was asked for on behalf of the trustees for their counsel. The fees of counsel for the several beneficiaries of the estate were fixed by the court, upon the special and independent application of counsel for William H. Post, the undersigned declining to ask for any specific amount, and merely acquiescing in the application, leaving it to the court to determine what was proper in the premises. The counsel for the trustees was not heard on this application, and did not participate in it in any manner, even if present, nor can he be presumed to know anything about it.

If the trustees deem the case incomplete upon the record in any manner, they have only to express the wish to have the subject-matter printed and it will be complied with. The undersigned so wrote their solicitor in October last, before receiving notice of the motion upon which this statement is based. If the trustees desire to prove *aliunde* any fact or facts which they may think material upon the question of their allowances, and not now contained in the record, the undersigned is willing to have them do it, subject to the right of cross-examination and contradiction, and to let the decree stand, treating the new proof as if before the vice-chancellor when making the decree; or the undersigned is willing to have the whole matter reopened and redetermined upon such proofs as any party may desire to present.

Respectfully submitted, upon the solemn responsibility of the undersigned, as a counselor of this court, and according to his best understanding, recollection and belief of the facts as they occurred, he at the same time objecting and excepting to any change in or addition to the record in said cause as it now appears before this honorable court, and to any change in the status of the appeal already taken herein, and which foregoing statement he hereby offers to further verify before the court, and to submit himself to cross-examination thereon, if desired.

*Mr. Preston Stevenson* and *Mr. J. D. Bedle*, for the appellants.

*Mr. John H. Reynolds* and *Mr. Theodore Runyon*, for the respondents.

Van Houten *v.* Van Houten.

The opinion of the court was delivered by

DIXON, J.

This appeal relates only to the allowance of commissions to two trustees, who were appointed by the court of chancery instead of the trustees named in the will of Rachel Van Houten.

The objection first raised by the appellants is, that the chancellor had no authority to allow more than the rates mentioned in section 110 of the "Act respecting the orphans court, and relating to the powers and duties of the ordinary and the orphans court and surrogates." *Rev. p. 776.*

This objection is not tenable. The practice of allowing compensation to executors, administrators, guardians and trustees has long prevailed in New Jersey. *Den* v. *Allen, Penn. \*35, \*44; State Bank* v. *Marsh, Sax. 288, 296.* The earliest legislation limiting such allowances was passed March 17th, 1855, as a supplement to "An act respecting the orphans court and the power and authority of surrogates." *Nix. Dig. 561.* Under that title it could not constitutionally control the court of chancery, and it was very soon judicially considered not to have that effect. *Holcombe* v. *Holcombe, 2 Beas. 415–419.* The present legislation is under a title somewhat broader, but which, still, does not attempt to embrace the court of chancery. The discretion of that court on this subject is unfettered by statute.

The second objection is, that the allowance is excessive.

The trustees were appointed January 7th, 1881, and the decree for their discharge was made July 16th, 1888. The estate which came under their control comprised bonds and mortgages and cash amounting to $15,179.22, and twenty tracts of realty in or near Paterson, of which nine were improved. They had power to lease and to sell the real estate, and have sold, of that which was unimproved, more than $260,000 worth. At the time of their discharge there remained realty estimated to be worth $137,500, of which more than half was improved, and some had been bought in by them on foreclosure of mortgage. They have collected interest and rent amounting to about $80,000.

The chancellor, having previously awarded the trustees compensation at five per centum upon the income collected, and also upon $52,961 of the *corpus* of the estate, made them a further allowance, by the decree now before us, of five per centum upon the residue of the *corpus*, being $224,852 of personal estate and $137,500 of realty. The entire estate amounts to nearly $500,000, and the commissions, therefore, to nearly $25,000.

We have examined carefully the nature and amount of the services rendered and the risk incurred by the trustees, and are of opinion that the allowance of five per centum upon the income should stand, and that the allowance upon the residue of the *corpus* should be so reduced as to make the entire allowance upon the *corpus* at the rate of three and one-half per centum.

*Decree unanimously reversed.*